[Cite as *McArthur v. Bowling Green State Univ.*, 2012-Ohio-4000.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

JESSICA MCARTHUR, et al.

   Plaintiffs

   v.

BOWLING GREEN STATE UNIVERSITY

   Defendant

Case No. 2010-06559

Judge Clark B. Weaver Sr.

DECISION

{¶ 1} Plaintiffs brought this action alleging medical negligence and loss of consortium. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.[1]

{¶ 2} In 2005 and 2006, plaintiff Jessica McArthur was a member of the gymnastics team at defendant Bowling Green State University (BGSU).[2] During her participation on the team, plaintiff suffered from various injuries and ailments which were treated, in part, by members of BGSU's athletic department, including athletic trainers Kim Deaver and Megan Nixon. To help alleviate her symptoms, plaintiff was provided both prescription and non-prescription nonsteroidal anti-inflammatory medication (NSAID), including ibuprofen and Celebrex, a prescription drug.

{¶ 3} Plaintiff was also treated at BGSU's student health center. On February 1, 2005, she was examined by Richard Chapman, M.D. for a rash on her ankle which was

---

[1]Plaintiffs' February 1, and March 15, 2012 motions to exceed page limitations pursuant to L.C.C.R. 4(E) are GRANTED instanter.

[2]Throughout this decision, "plaintiff" shall refer to plaintiff Jessica McArthur.

likely related to tape that had been applied to her ankles during gymnastics practice. Dr. Chapman provided plaintiff with an antihistamine and topical steroid cream and he instructed her to return within a week if the symptoms had not resolved. During that visit, Dr. Chapman noted that plaintiff's blood pressure was 150/80 (mmHg). Plaintiff did not return to the student health center until December 6, 2005 when she was examined for a pre-participation physical, during which her blood pressure was 112/64, well within the normal range.

{¶ 4} On January 26, 2006, plaintiff was examined at the student health center by Robert Heizelman, M.D. for symptoms including a sore throat. During the examination, plaintiff's blood pressure was elevated, 140/100. Dr. Heizelman ordered tests which provided a complete blood count (CBC), and showed that plaintiff's symptoms were not the result of either mononucleosis or streptococcus. Dr. Heizelman prescribed ibuprofen to treat plaintiff's sore throat.

{¶ 5} In August 2006, plaintiff attended a pre-participation physical in preparation for the BGSU gymnastic training and meet season. During the physical examination, a trainer measured plaintiff's blood pressure and notified Randy Trimpey M.D., the attending physician, of the abnormally high reading, 150/112. Dr. Trimpey measured plaintiff's blood pressure and when he obtained another high reading, he had her sit for a few minutes before taking a follow-up reading, which was also elevated. Dr. Trimpey instructed plaintiff to report to the athletic department in the morning for additional blood pressure readings. Plaintiff informed her parents of the high blood pressure readings and they consulted with plaintiff's primary care physician, Khalida Durrani, M.D.

{¶ 6} Based upon Dr. Durrani's advice, plaintiff was examined at Wood County Hospital where she was ultimately diagnosed with kidney failure and transferred to The Toledo Hospital. Plaintiff was referred to two nephrologists, Allen Flickenger, M.D. and Syed Abidi, M.D., who each independently confirmed her renal disease. On October 26, 2006, a needle biopsy was performed on plaintiff's right kidney. A biopsy report

states that the "final diagnosis" was "Focal global glomerulosclerosis, extensive, with tubular atrophy and interstitial fibrosis, extensive; Interstitial nephritis, chronic-active; Arterial and arteriolar sclerosis, moderately severe." (Joint Exhibit A, page 466.) As a result of the reduced function of her kidneys, plaintiff underwent a kidney transplant in December 2006; the kidney was donated by her father, plaintiff James McArthur.

{¶ 7} Plaintiffs assert that the actions of defendant's employees, Kim Deaver, Megan Nixon, and Drs. Chapman and Heizelman, breached the applicable standard of care regarding their treatment of plaintiff and that such breach was the cause of plaintiff's renal disease. Specifically, plaintiffs asserts that Deaver and Nixon distributed Celebrex to gymnasts, including plaintiff, who were not required to see a physician prior to receiving the prescription medication. Plaintiffs also contend that Drs. Chapman and Heizelman deviated from the standard of care after plaintiff presented with elevated blood pressure in that the doctors failed to perform appropriate tests, including additional serial blood pressure readings.

{¶ 8} "In order to establish medical malpractice, it must be shown by a preponderance of the evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct result of such doing or failing to do some one or more of such particular things." *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, paragraph 1 of the syllabus. The appropriate standard of care must be proven by expert testimony. Id. at 130. "[E]xpert opinion regarding a causative event, including alternative causes, must be expressed in terms of probability irrespective of whether the proponent of the evidence bears the burden of persuasion with respect to the issue." *Stinson v. England*, 69 Ohio St.3d 451, 1994-Ohio-35, paragraph one of the syllabus.

{¶ 9} Both Deaver and Nixon testified regarding their duties as BGSU gymnastic trainers and their knowledge of plaintiff's access to Celebrex.  From 2003 through July 2005, Deaver was a graduate assistant at BGSU studying for a masters degree in developmental kinesiology.  Deaver was a trainer for the BGSU gymnastics team from September through April for both the 2003-2004 and 2004-2005 seasons.  Deaver testified that she did not provide Celebrex to plaintiff and that there would be a record on plaintiff's training chart if she had done so.  According to Deaver, the only medications she discussed with plaintiff were plaintiff's usage of birth control pills and Lexapro, an anti-anxiety medication.

{¶ 10} Nixon was also a graduate assistant at BGSU studying for a masters degree in developmental kinesiology during her tenure as a gymnastics trainer.  Nixon worked with plaintiff from August 2005 through April 2006.  According to Nixon, she was directed by the team physician, Jeffrey Noftz, II, M.D., to provide plaintiff with three packets of Celebrex, each packet contained three pills.  Nixon testified that Celebrex was made available to the gymnasts only by a doctor's order.  In late January or early February 2006, a meeting was held with the gymnastics team during which team members were instructed to stop asking for Celebrex.

{¶ 11} Several of plaintiff's teammates testified regarding the distribution of Celebrex by BGSU trainers.  Jillian Monahan testified that she was a member of the gymnastics team from 2003-2007 and that she was provided with Celebrex in 2005, after she asked a trainer for the medication.  Monahan testified that she thought the trainer was authorized by a doctor to dispense the medication.  According to Monahan, plaintiff received Celebrex from Deaver in 2005.  Monahan recalled a team meeting in early February 2006, during which Douglas Boersma, BGSU's head athletic trainer, directed the team members not to request Celebrex.  Monahan testified that BGSU employees stopped distributing Celebrex after the meeting.  Plaintiff's former teammates, Erin Coudriet and Bethany Kenel testified by deposition that they also

recalled receiving Celebrex from a trainer.  However, Coudriet was not aware of plaintiff receiving Celebrex.

{¶ 12} Plaintiff testified that on more than one occasion, beginning in November 2004, she received Celebrex from her trainers to treat chronic lower-back pain. According to plaintiff's BGSU training records, Dr. Noftz examined her and prescribed Celebrex in January 2006.  On cross examination, plaintiff admitted that she was confused about the dates on which she received Celebrex and she conceded that in her September 2008 deposition she testified that she began taking Celebrex in November 2005.  Plaintiff was also unable to recall when she last took Celebrex; she could not recall whether she took Celebrex after the February 2006 meeting with Boersma. Plaintiff was also uncertain about the amount of Celebrex she took; she stated that she took Celebrex "as needed" when she experienced back pain.

{¶ 13} Plaintiffs presented the testimony of two medical experts. Plaintiffs' first expert, Larry Davis, M.D., a board-certified family practice physician, testified as to the standard of care applicable to Drs. Chapman and Heizelman, BGSU health center physicians.  Dr. Davis testified that a single abnormally elevated blood pressure reading requires additional serial blood pressure checks to determine whether the abnormal reading was a "sustained" reading, or a one-time reading.  According to Dr. Davis, serial blood pressure tests are needed to confirm the existence of hypertension, a diagnosis that may indicate a correctable or preventable medical condition.  Dr. Davis testified that a diagnosis of hypertension would also require blood tests to measure creatinine levels, ultrasound imaging of the kidneys, and a urine drug screen to determine whether drugs or alcohol contributed to increased blood pressure.  Dr. Davis also opined that the standard of care required Drs. Chapman and Heizelman to explain the risks and consequences of her condition.

{¶ 14} Plaintiffs also presented the testimony of Timothy Hammond, M.D., who is board certified in both a nephrology and internal medicine.  Dr. Hammond testified that

the standard of care required Drs. Chapman and Heizelman to perform follow up blood pressure tests, conduct a physical examination, order imaging if necessary, and take a medical history, including use of NSAIDs. Dr. Hammond stated that blood pressure is classified according to the Joint National Committee on Prevention, Detection, Evaluation and Treatment of High Blood Pressure (JNC7), which categorizes blood pressure below 120/80 (systolic/diastolic) as normal. (Plaintiffs' Exhibit 6.) Dr. Hammond was particularly critical of Dr. Heizelman for prescribing ibuprofen, an NSAID medication, knowing that plaintiff's blood pressure was 140/100. According to Dr. Hammond, the use of NSAID medications can be a "big problem" for young patients with hypertension. Dr. Hammond opined that Dr. Heizelman deviated from the accepted standard of care by not ordering blood tests for BUN and creatinine levels to evaluate kidney function; the CBC test ordered by Dr. Heizelman did not check kidney function.

{¶ 15} On the issue of causation, Dr. Hammond testified that plaintiff had a known allergy to Bextra, an NSAID, and he opined that she likely suffered an allergic reaction to Celebrex. Dr. Hammond opined that plaintiff's renal disease was reversible had the offending allergen been diagnosed and removed in February 2005 when she was treated by Dr. Chapman. Dr. Hammond had the same opinion as to the January 26, 2006 involvement of Dr. Heizelman, except that "there would have been some small chronic ailment at that point, but it wouldn't have affected the long-term outcome." (Transcript, page 338.) Dr. Hammond based his opinion on his belief that the allergic reaction continued to damage plaintiff's kidneys throughout the time she used NSAIDs, and eventually resulted in chronic interstitial nephritis, kidney failure, end-stage renal disease, and the ultimate need for a kidney transplant.

{¶ 16} In response to plaintiffs' evidence, defendant presented the testimony of Michael Yaffe, M.D. and Arnold Berns, M.D. Dr. Yaffe is a board-certified internal medicine physician who has treated students at The Ohio State University student

health services.  Dr. Yaffe explained in detail his procedure for treating a patient with an isolated elevated blood pressure.  Regarding plaintiff's February 1, 2005 visit to the BGSU student health clinic, Dr. Yaffe opined that Dr. Chapman properly diagnosed and treated plaintiff's dermatitis.  Dr. Yaffe opined that an isolated elevated blood pressure reading does not require repeat testing for an otherwise healthy young patient who does not exhibit any systemic complaint.  In support of his opinion, Dr. Yaffe noted that, plaintiff had a normal blood pressure reading, 112/64, approximately ten months after the February 2005 visit, which does not support a diagnosis of hypertension.  According to Dr. Yaffe, plaintiff's elevated blood pressure on February 1, 2005 was most likely a "situational rise," known as "white coat syndrome" which was not indicative of disease.

{¶ 17} With regard to plaintiff's second visit to the BGSU student health clinic on January 26, 2006, Dr. Yaffe opined that plaintiff received appropriate treatment for her sore throat and that her elevated blood pressure on that date was likely caused by a combination of her use of Nyquil, pain she was experiencing, and her pre-existing anxiety condition.  According to Dr. Yaffe, the elevated eosinophil level that was noted in the CBC did not show that plaintiff had an allergic reaction inasmuch as her total white blood count was normal.  Dr. Yaffe testified that plaintiff did not exhibit any of the symptoms of allergic interstitial nephritis at the time of her visit to the BGSU clinic; fever, back pain, blood in her urine, or difficulty in urination.

{¶ 18} Defendant's second expert, Dr. Berns, is a board-certified nephrologist, a clinical professor of medicine at the University of Illinois College of Medicine, and he assists in writing the board examination for nephrology.  Dr. Berns testified that the results of plaintiff's kidney biopsy do not show excessive NSAID use.  When asked to assume that plaintiff took Celebrex and ibuprofen for 21 months, as she alleges, Dr. Berns opined that "those medications played a minimum role, if any role whatsoever, in the fact of the matter that she developed end-stage kidney failure and needed a kidney transplant."  (Transcript, page 450.)  According to Dr. Berns, plaintiff's biopsy does not

show excessive use of NSAIDs. Berns testified that "there has never been a reported case anywhere in the entire world's literature of Celebrex causing end-stage kidney disease." (Transcript, page 451.) Dr. Berns testified that "acute syndrome" caused by NSAIDs have certain symptoms and that plaintiff did not show any evidence of such symptoms. Dr. Berns opined that the cause of plaintiff's nephrosclerosis was genetic. Dr. Berns commented on the ultrasound which showed that plaintiff's kidneys were very small and he noted that it would take "years" for plaintiff's kidneys to shrink to that size, not the period of months asserted by plaintiffs. Dr. Berns opined that even if plaintiff's renal disease had been diagnosed earlier, she would not have had a different outcome due to the chronic nature of her disease.

{¶ 19} The court finds that the testimony of Drs. Yaffe and Berns was more persuasive than that of Drs. Davis and Hammond. The court was particularly persuaded by Dr. Bern's testimony regarding the ultrasound results, the biopsy report, and the lack of support in medical literature regarding a causal link between Celebrex and end-stage kidney disease. Dr. Hammond conceded that the nephrologists and transplant surgeons who treated plaintiff did not suggest that Celebrex was the cause of plaintiff's renal disease. Although the court is persuaded that defendant's employees distributed Celebrex to plaintiff and other gymnasts without performing both thorough medical examinations and careful record keeping, the court is convinced by the evidence that plaintiff's use of Celebrex was not related to her kidney disease. Therefore, any negligence by defendant's employees in distributing Celebrex to plaintiff was not a proximate cause of her renal disease.

{¶ 20} Furthermore, the court finds that plaintiffs have failed to prove by a preponderance of the evidence that the standard of care required defendant's physicians to perform serial blood pressure tests based upon plaintiff's clinical presentation, or that the failure to obtain such was the proximate cause of her renal disease. Dr. Yaffe provided credible testimony that it is not uncommon for a patient to

have an isolated elevated blood pressure during a physical examination and that the treating physician must use clinical judgment to determine whether additional testing is needed. Indeed, plaintiff had normal blood pressure readings after her visits with both Drs. Chapman and Heizelman. The greater weight of the evidence shows that Drs. Chapman and Heizelman met all applicable standards of care in their treatment of plaintiff and that her clinical presentation did not warrant serial blood pressure checks or other follow-up testing. Moreover, plaintiffs did not present sufficient evidence to prove to the court that an earlier diagnosis would have prevented plaintiff's end-stage kidney failure and the need for a kidney transplant. Rather, the court was persuaded by Dr. Bern's testimony that the outcome would have been the same even if plaintiff's renal disease had been diagnosed earlier. Consequently, plaintiffs cannot prevail on their medical malpractice claims.

{¶ 21} Plaintiffs James and Kimberly McArthur have asserted claims for loss of consortium. A claim for loss of consortium is derivative in that the claim is dependent upon the defendant's having committed a legally cognizable tort upon the plaintiff who suffers bodily injury. *Bowen v. Kil-Kare, Inc.* (1992), 63 Ohio St.3d 84, 93. Inasmuch as plaintiffs have failed to prove their claims of negligence, the loss of consortium claims must also fail.

{¶ 22} For the foregoing reasons, the court finds that plaintiffs have failed to prove any of their claims by a preponderance of the evidence and, accordingly, judgment shall be rendered in favor of defendant.



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

JESSICA MCARTHUR, et al.

    Plaintiffs

    v.

BOWLING GREEN STATE UNIVERSITY

    Defendant

Case No. 2010-06559

Judge Clark B. Weaver Sr.

JUDGMENT ENTRY

{¶ 23} This case was tried to the court on the issue of liability.  The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of defendant.  Court costs are assessed against plaintiffs.  The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.


_____
CLARK B. WEAVER SR.
Judge

cc:

Brian M. Kneafsey, Jr.
Assistant Attorney General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

Thomas W. Gallagher
400 Toledo Legal Building
416 North Erie Street
Toledo, Ohio 43604-5622

004
Filed May 15, 2012
To S.C. Reporter August 31, 2012